**STARK & STARK**
A Professional Corporation
Timothy P. Duggan, Esq (TD-3231)
993 Lenox Drive, Bldg. 2
Lawrenceville, NJ 08648-2389
(609) 896-9060
Attorneys for Farm Credit East, ACA

| | |
|---|---|
| In the Matter of:<br><br>ANTHONY M. MORTELLITE, JR., and COLLEEN MORTELLITE,<br><br>                    Debtors. | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY<br><br>CASE NO. 17-21818 (ABA) |
| In the Matter of:<br><br>BLUES BROTHERS, LLC,<br><br>                    Debtor. | CASE NO. 17-21820 (ABA)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO SECOND AMENDED CHAPTER 12 PLAN** |

## PRELIMINARY STATEMENT

The Debtors' Second Amended Plan (the "Plan") cannot be confirmed because:

1. <u>The Plan is Not Feasible.</u>  The Debtors' have failed to provide for the payment of Farm Credit East, ACA's ("Farm Credit") administrative claim in the sum of $158,262 or the Chapter 12 Trustee's final claim. The Debtors are using an estimate for the Chapter 12 Trustee's legal fees from before the first confirmation hearing.   Other issues that impact feasibility are (i) failure to address the potential on an injunction under the state court action filed by Mr. Lance, including a claim for injunctive relief and damages accruing post-petition, and (ii) the cash flow projections are not reliable or accurate.

2.  <u>Farm Credit is Not Being Paid The Present Value of its Allowed Secured Claim Under
Reasonable Terms</u>.  The Debtors' appraiser uses the wrong valuation standard and fails to
appraise the blueberry bushes.  Specifically, there is no opinion of the ***replacement value
of the blueberry farm***.  As a result, the Debtors have failed to meet their burden of proof
on value and Farm Credit's claim is an allowed, fully secured claim entitled to be paid in
full.  Further, paying Farm Credit's fully secured claim over 38 years is not commercially
reasonable.

3.  <u>The Petition, Schedules and Plan Have Been Fled in Bad Faith</u>.  The Debtors have been
playing fast and loose with their testimony and schedules.  For example, Mr. Mortellite
signed all of the bankruptcy schedules in both cases.  At the beginning of the case, he
swore under penalty of perjury Blues Brothers owned the crops.  Part way through the
case, Mr. Mortellite amended Schedule B to allege he owns some of the crops, but in an
"unknown" amount, since he had to find a way to get cash proceeds into his individual
estate.  At his deposition held on September 26, 2017, he was unable to explain who
owns what when it came to the crops.  However, Mr. Mortellite did confirm that in 2016,
2015 and 2014, 100% of the income from the sale of crops was reported on the Blues
Brothers' tax returns; nothing on his personal income tax return.  This is a crucial issue
since the estates have not been substantively consolidated.

4.  <u>The Plan Seeks to Substantively Consolidate The Cases</u>.  The Debtors are using
consolidated income to pay consolidated expenses.  For example, what funds are being
used to pay the separate administrative expenses of each estate?  If Blues Brothers'
income is being used to pay the administrate expenses of the individual case, how is that
not a backdoor attempt to substantively consolidate the cases?

4844-3950-6260, v. 1

## STATEMENT OF FACTS

The following facts are relevant to the legal and factual issues that will be raised at the confirmation hearing.

    1.  **Farm Credit – Secured Creditor**.

Farm Credit filed a proof of claim in each bankruptcy case.[1]  The claim was filed as a secured claim with the collateral being as follows:

    A.  <u>Blues Brothers' Case</u>:  all personal property and fixtures, including plants, crops, inventory, machinery, equipment and cash collateral.

    B.  <u>Individual Case</u>: debtor's farm, fixtures, personal property including plants, crops, inventory, machinery, equipment and cash collateral.

Farm Credit's lien in the machinery and equipment is subject to a lien in favor of the United States Department of Agricultural (about $34,000).

For purposes of the confirmation hearings only, and with an express reservation of rights to seek the allowance of post-petition interest and legal fees, the balance due to Farm Credit can be *__estimated__* as follows:

| | |
|---|---|
| Proof of claim amount | $1,663,352.46 |
| Less:  Adequate protection payments | <130,000.00> |
| Balance Due: | $1,533,352.46 |

    2.    **Value of Collateral**.

The Debtors produced an appraisal report prepared by Edwin F. Kay, who opined to a value of $600,000 for the farm. Farm Credit produced an appraisal report prepared by Lana Chiappetta, who opined to a value of $2,300,000 for the farm.  The main difference in the

---

[1] Claim number 7 in the individual case (17-21818) and claim number 3 in the business case (17-21820).

appraisals is Mr. Kay did not value the blueberry bushes or revenue generated by the blueberry bushes, while Ms. Chiappetta did value the blueberry bushes.

Farm Credit and the Debtors stipulated to a value of $123,275 for the equipment retained by the Debtors. Farm Credit also holds a lien on all cash, accounts receivable and all assets owned by the individual Debtors.

      3.      **Payment of Farm Credit Claim**.

In the event the Court finds that Farm Credit is a fully secured creditor, it would about 38 years to fully pay the secured claim, assuming interest rates do not rise. A copy of an amortization schedule is attached hereto as Exhibit "A".

      4.      **Confirmation Hearing Issues**

The primary factual issues to be decided by the Court at the confirmation hearing are (1) the value of the farm owned by the individual Debtors, (2) the value of the crops, accounts receivable and equipment owned by the corporate Debtors and/or individual Debtors, (3) whether the individual Debtors own any plants and/or crops, (4) whether the Debtors can generate sufficient cash flow to meet their burden of proof on feasibility, (5) whether the Debtors are contributing their disposal income to the Chapter 12 bankruptcy plan, (6) whether Farm Credit's claim is being paid under commercially reasonable terms, (7) whether Farm Credit's claim for lack of adequate protection is an administrate claim, and (8) whether the Plan and petition were filed in good faith.

The objections set forth below are the primary objections of Farm Credit to confirmation of the Chapter 12 plans. Many of the objections will need to be fine-tuned after testimony is provided to the Court since the Debtor has chosen to hide the ball until the final hearing.

4844-3950-6260, v. 1

## LEGAL ARGUMENT

### I.   Farm Credit's Administrative Claim is Not Being Paid in Full Under The Plan.

Farm Credit filed a motion for an administrative claim in the sum of $158,262 which must be paid in full at confirmation.  11 U.S.C. § 1222(a)(2).  Since the claim is not being paid in full, the Plan cannot be confirmed.

### II.   Farm Credit is an Over-Secured Creditor and Must be Paid in Full Under Commercially Reasonable Terms.

Farm Credit filed a proof of claim in each bankruptcy case.[2]  In the event the Court finds that Farm Credit is over-secured, Farm Credit will seek the allowance of post-petition interest and post-petition legal fees and expenses.  11 U.S.C. § 506(b) and 1225(a)(5).

For purposes of the confirmation hearings only, and with an express reservation of its right to seek post-petition interest and legal fees, the balance due to Farm Credit can be estimated at no less than $1,533,352.46.  Once the Court determines the value of the farm, value of the equipment, value of the crops, and value of all other property (i.e., balance of cash in bank accounts, accounts receivable, ect.), the Court will be able to determine whether or not Farm Credit is a fully secured creditor and entitled to post-petition legal fees.

In regards to the burden of proof, the Third Circuit has adopted a shifting standard when it comes to secured proofs of claim.  *In In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012).  A proof of claim is *prima facie* evidence as to the validity and amount of a properly filed claim under §502(a) and Bankruptcy Rule 3001(f).  As a result, the debtor bears the initial burden of negating a presumptively valid amount of a secured claim. If sufficient evidence is

---

[2] Claim number 7 in the individual case (17-21818) and claim number 3 in the business case (17-21820).

provided of the secured claim's value, the burden shifts to the claimant to refute that evidence by a preponderance of the evidence as to the extent of the lien and the value of the collateral.

Farm Credit does not believe the Debtors have met their initial burden of proof on the extent, validity and amount of Farm Credit's secured claim. The United States Supreme Court adopted a "replacement value" standard for cram down cases. *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 956 (1997). In this case, the Debtors are continuing to operate the property as a blueberry farm – an undisputed fact.[3] As a result, the Debtors must ***offer admissible evidence of the replacement value of the blueberry farm*** – "the cost the debtor would incur to obtain a like asset for the same proposed use." *In In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012). *See Farmers & Merchants v. Southall*, 475 B.R. 274, 278 (M.D. Ga. 2012) (""Thus, according to this Court's reading of *Rash*, considering the specific use of the collateral is not only advisable, but necessary under § 506."); *Farmers & Mechanics Bank v. Southall, III*, U.S. District. Middle District GA (U.S.D.C.Ga. 2011)(attached hereto as Exhibit "B").

In *Southall*, a Chapter 12 debtor and farm lender litigated the proper valuation standard under Bankruptcy Code § 506(a) for a farm located in Georgia. In that case, the lender valued the farm as "vacant land" and admitted that he did not "consider whether the land was irrigated or cultivated, farmland or timberland." (*Id.*, at 7). The Bankruptcy Court rejected the valuation opinion because the appraiser did not take into consideration that "505.31 acres was used as a farming operation." On appeal the District Court noted that

> Thus, according to this Court's reading of <u>Rash,</u> considering the specific use of the collateral is not only advisable, but necessary under § 506. If land is used as farmland, as in this case, the valuation must take into consideration relevant factors like soil analysis, availability of water, percentage of crop land

---

[3] Farm Credit believes there are circumstances where the definition of replacement value may not be driven by the unilateral decision of a debtor to harvest a specific crop or put the farm to a specific use. Here, since it is clear that the blueberry bushes generate almost 100% of the revenue for the estates, the Court should determine the replacement cost of similar types of farm with similar types of plants.

-6-

to total land, agricultural history, and irrigation statistics. Only by using these factors can the court determine the cost a person would pay to obtain a like asset and obtain a proper valuation.

It is undisputed that Mr. Massengill did not consider the property at issue as farmland, but instead conducted his appraisal by valuing the property as vacant land. He stated during his testimony at the valuation hearing that "I was asked to appraise both tracts simply as vacant land regardless of improvements except for the contributory value of the home located on the property." (Doc. 1-4, p. 4.) Mr. Massengill admitted that he did not consider whether the land was irrigated or cultivated, farmland or timberland.

*Southall*, at 7.

In this case, the Debtors' appraiser did not value the blueberry bushes or how the blueberry bushes impact the value of the farm. In fact, he did not take into account any farming operations at all. At his deposition, the Debtors' appraiser stated he did not have an opinion of what it would cost the Debtors to purchase a similar blueberry farm – all he did was value agricultural land.

Assuming Farm Credit is a fully secured creditor, it will take about 38 years to pay its claim. Moreover, making annual payments of $100,000 per year three months after the full crop has been harvested is not commercially reasonable. *See In re Howe*, Case No. 13-61601 (N.D.N.Y. Bankr. 2014)(attached as Exhibit "C"). Although this is an unreported case, it is factually on point on the plan issues and *cites numerous reported decisions*, therefore it is instructive and supports Farm Credit's position.

In *Howe*, the parties stipulated to the treatment of the claim secured by real estate (20 years at 5.25%). (*Howe*, p. 3, footnote 1). The issue in dispute was repayment of the "personal property secured claim" which the debtor originally proposed to treat as long-term debt to be repaid over 30 years with interest at 5% per annum. (*Id.*, p. 3). After the lender objected, the debtor conceded its terms were not reasonable and proposed repayment over 12 years with interest at 6% per annul. The bank objected to this treatment too. (*Id.*)

At the hearing, the bank presented the testimony of a bank office who testified that customary terms for this type of loan ranged from 5 to 7 years, with 7 years to borrowers with outstanding credit and favorable loan to value ratios. *(Id.*, at 4). As for interest rates, he opined a 7.25% to 8.5% rate. (*Id.*). After receiving testimony, the Court reviewed the controlling law:

1.    "The present value requirement under Bankruptcy Code § 1225(a)(5)(B)(ii) forces the debtor to provide for payments to creditors over a reasonable repayment term at a reasonable rate of interest. *In re Standley*, 2013 Bankr. LEXIS 1114, at *16 (Bankr. D. Mont. Mar. 22, 2013) (citing *In re Steinmetz*, 10 B.R. 150, 158 (Bankr. D. Mont. 1991))." (*Howe*, at 7)

2.    "While the Code does not specifically limit the repayment period, the present value and feasibility provisions imply such limits." *In re Torelli*, 338 B.R. at 397 (citing *In re Dunning*, 77 B.R. 789, 793 (Bankr. D. Mont. 1987) (quoting *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125 (Bankr. D. Mont. 1987)). "When considering the length of loan term, the court can base a ruling on such facts as the preexisting contract length and the customary length of repayment of similar loans." *Id.* (collecting cases)." (*Id.*)

3.    "Since the Bankruptcy Code does not provide any guidance on how to determine an appropriate or equitable rate of interest, courts are necessarily guided by customary lending practices and, more specifically, the current market rate for similar loans made in the region at the time of the reorganization. *In re Ellis*, 478 B.R. 132, 140 (Bankr. N.D.N.Y. 2012); *In re Foertsch*, 167 B.R. at 564 (collecting cases)." (*Id.*)

The *Howe* court found that the debtor's repayment terms were not reasonable and denied confirmation of the plan.

Farm Credit served an expert report of a loan officer who will testify to commercially reasonable repayment terms of agricultural loans secured by farms (25 years with monthly payment). The like Court in *Howe*, this Court should find that a repayment term of 38 years with

-8-

annual payments of $100,000 per year is not commercially reasonable and shifts too much risk on the secured creditor.

### III. Debtors Have Failed to Prove They Are Contributing all of Their Disposal Income to the Plan.

Bankruptcy Code §1225 (b)(1)B) requires the Debtors to submit all of their disposal income to the plan.  Here, the budget does not contain any detail on the Debtors' individual expenses so creditors cannot determine what expenses are being paid.

### IV. The Debtors Have Failed to Establish that the Plan is Feasible.

The Debtors are trying to distance themselves from their prior budgets by hiring an accountant to "clean the books."  The Debtors produced two budgets prior to confirmation, including a budget during the course of the original cash collateral hearing dated June 9, 2017 and a second budget dated July 28, 2017.  It is important to note that the second budget was prepared at the end of July 2017, which is at the end of the harvest season so the income and expenses were known. Both of these budgets clearly establish the Debtors do not have sufficient income to confirm a plan.

Now, the Debtors allege they will have supplemental income ($12,000) from the same job Mr. Mortellite had last year and receive substantial loans from a relative.  However, the cash flow budget prepared by the accountant has numerous flaws which will be raised at the hearing. Also, the proposed gifts by an insider are suspect.

Farm Credit incorporates the objections to feasibility made by the Chapter 12 Trustee.

4844-3950-6260, v. 1

## V. The Plan and Case Were Filed in Bad Faith.

The Debtors have been playing fast and loose throughout this case, seeking to change the facts to fit their need.  Farm Credit reserves the right to object on bad faith grounds once the testimony is placed on the record.

## VI. The Debtors Seek to Improperly Consolidate the Cases.

The Debtors have captioned the Plan as a joint plan, but it is really a backdoor way of seeking to substantively consolidate the cases. Substantive consolidation is a much different animal than joint administration. Substantive consolidation merges the assets and liabilities associated with two bankruptcy estates into a single estate which will result in one plan of reorganization and creditors in one case being subject to the rights and interests of creditors in the other case. In this case, the Debtors try to describe the two estates in a smoke and mirror attempt to draw the Court's attention away from what is really happening.

By way of example:

1.     What are the total administrate claims in the Blues Brothers case?  What are the total administrative claims in the individual case?  Which estate is paying for the litigation from the cash collateral hearings or the first plan? The Plan does not disclose this fact.

2.     Mr. Kasen is counsel for two separate debtors. However, he fails to even estimate his administrative claim for either estate.  Based upon the budget, it appears the combined legal fees and accounting fees are at least $81,000.  How much of this claim is for the individuals' case and how will the individuals pay their portion?  Why should the creditors of Blues Brothers pay the administrative expenses of the individuals' case without having the Court substantively consolidate the cases?  Where is the law to support this?

-10-

3.      The Chapter 12 Trustee will need to allocate her expenses and commissions among the two estates. Assuming the allocation is a fifty-fifty split, how will the individuals pay this claim if they are only getting $6,000 per month?

4.      The IRS has a priority tax claim against Blues Brothers, but the "Debtors" will pay the allowed priority tax claim.  Is the money to pay this claim coming from the Blues Brothers' estate or the individuals' estate?

VII.    **There is no Liquidation Analysis.**

There is no liquidation analysis in order for the Court to make a finding under Bankruptcy Code §1225 (a)(6).  For example, Mr. Kay concedes he did not value the blueberry bushes on the farm or take into account the cash and profits generated from the blueberry operation.  How are those bushes and revenue taken into account in a liquidation analysis?

VIII.   **Any Dismissal Should be With Prejudice**.

At the first hearing, the Court denied confirmation and granted Farm Credit stay relief. Since the time to file and confirm a plan had passed and the Debtors failed to seek additional time to file and confirm a plan, the Court exercised its powers under section 105 of the Bankruptcy Code and *sua sponte* extended the time for the Debtors to file a Second Amended Plan.  Section 105(a) gives the Court the power to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

-11-

The Court threw a lifeline to the Debtors at the expense of Farm Credit who is forced to once again challenge and object to a frivolous Chapter 12 plan. If the Plan is not confirmed, the Court should dismiss the Chapter 12 case, with prejudice, or amend that the prior Order granting stay relief to make it with prospective relief.  This is only fair since the Court granted the Debtors the effect of a second case despite the clear deadlines in Chapter 12.  If this case is not confirmed, any dismissal should be **with prejudice**.

STARK & STARK
A Professional Corporation
Attorneys for Farm Credit East, ACA


By:/s/ Timothy P. Duggan
TIMOTHY P. DUGGAN

Dated:  November 13, 2017

# EXHIBIT "A"

| Date | Interest rate | Total Payment P+I | Principal Balance | Daily Interest Accrual | Days This Period | Interest This Period | Interest Principal Balance |
|---|---|---|---|---|---|---|---|
| 10/5/2017 | | | $1,553,352.46 | 234.0668 | 0 | $0.00 | $1,553,352.46 |
| 10/5/2018 | 5.500% | $100,000.00 | $1,553,352.46 | 234.0668 | 365 | $85,434.39 | $1,538,786.85 |
| 10/5/2019 | 5.500% | $100,000.00 | $1,538,786.85 | 231.8720 | 365 | $84,633.28 | $1,523,420.12 |
| 10/5/2020 | 5.500% | $100,000.00 | $1,523,420.12 | 229.5565 | 366 | $84,017.66 | $1,507,437.78 |
| 10/5/2021 | 5.500% | $100,000.00 | $1,507,437.78 | 227.1482 | 365 | $82,909.08 | $1,490,346.86 |
| 10/5/2022 | 5.500% | $100,000.00 | $1,490,346.86 | 224.5728 | 365 | $81,969.08 | $1,472,315.94 |
| 10/5/2023 | 5.500% | $100,000.00 | $1,472,315.94 | 221.8558 | 365 | $80,977.38 | $1,453,293.32 |
| 10/5/2024 | 5.500% | $100,000.00 | $1,453,293.32 | 218.9894 | 366 | $80,150.12 | $1,433,443.44 |
| 10/5/2025 | 5.500% | $100,000.00 | $1,433,443.44 | 215.9983 | 365 | $78,839.39 | $1,412,282.83 |
| 10/5/2026 | 5.500% | $100,000.00 | $1,412,282.83 | 212.8097 | 365 | $77,675.56 | $1,389,958.38 |
| 10/5/2027 | 5.500% | $100,000.00 | $1,389,958.38 | 209.4458 | 365 | $76,447.71 | $1,366,406.10 |
| 10/5/2028 | 5.500% | $100,000.00 | $1,366,406.10 | 205.8968 | 366 | $75,358.23 | $1,341,764.33 |
| 10/5/2029 | 5.500% | $100,000.00 | $1,341,764.33 | 202.1837 | 365 | $73,797.04 | $1,315,561.37 |
| 10/5/2030 | 5.500% | $100,000.00 | $1,315,561.37 | 198.2353 | 365 | $72,355.88 | $1,287,917.24 |
| 10/5/2031 | 5.500% | $100,000.00 | $1,287,917.24 | 194.0697 | 365 | $70,835.45 | $1,258,752.69 |
| 10/5/2032 | 5.500% | $100,000.00 | $1,258,752.69 | 189.6751 | 366 | $69,421.07 | $1,228,173.76 |
| 10/5/2033 | 5.500% | $100,000.00 | $1,228,173.76 | 185.0673 | 365 | $67,549.56 | $1,195,723.32 |
| 10/5/2034 | 5.500% | $100,000.00 | $1,195,723.32 | 180.1775 | 365 | $65,764.78 | $1,161,488.10 |
| 10/5/2035 | 5.500% | $100,000.00 | $1,161,488.10 | 175.0188 | 365 | $63,881.85 | $1,125,369.95 |
| 10/5/2036 | 5.500% | $100,000.00 | $1,125,369.95 | 169.5763 | 366 | $62,064.92 | $1,087,434.87 |
| 10/5/2037 | 5.500% | $100,000.00 | $1,087,434.87 | 163.8600 | 365 | $59,808.92 | $1,047,243.79 |
| 10/5/2038 | 5.500% | $100,000.00 | $1,047,243.79 | 163.8600 | 365 | $59,808.92 | $1,047,243.79 |
| 10/5/2039 | 5.500% | $100,000.00 | $1,047,243.79 | 157.8039 | 365 | $57,598.41 | $1,004,842.20 |
| 10/5/2040 | 5.500% | $100,000.00 | $1,004,842.20 | 151.4146 | 366 | $55,417.74 | $960,259.93 |
| 10/5/2041 | 5.500% | $100,000.00 | $960,259.93 | 144.6967 | 365 | $52,814.30 | $913,074.23 |
| 10/5/2042 | 5.500% | $100,000.00 | $913,074.23 | 137.5865 | 365 | $50,219.08 | $863,293.31 |
| 10/5/2043 | 5.500% | $100,000.00 | $863,293.31 | 130.0853 | 365 | $47,481.13 | $810,774.44 |
| 10/5/2044 | 5.500% | $100,000.00 | $810,774.44 | 122.1715 | 366 | $44,714.77 | $755,489.21 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/5/2045 | 5.500% | $100,000.00 | $755,489.21 | 113.8408 | 365 | $41,551.91 | $697,041.11 |
| 10/5/2046 | 5.500% | $100,000.00 | $697,041.11 | 105.0336 | 365 | $38,337.26 | $635,378.38 |
| 10/5/2047 | 5.500% | $100,000.00 | $635,378.38 | 95.7419 | 365 | $34,945.81 | $570,324.19 |
| 10/5/2048 | 5.500% | $100,000.00 | $570,324.19 | 85.9393 | 366 | $31,453.77 | $501,777.96 |
| 10/5/2049 | 5.500% | $100,000.00 | $501,777.96 | 75.6104 | 365 | $27,597.79 | $429,375.74 |
| 10/5/2050 | 5.500% | $100,000.00 | $429,375.74 | 64.7005 | 365 | $23,615.67 | $352,991.41 |
| 10/5/2051 | 5.500% | $100,000.00 | $352,991.41 | 53.1905 | 365 | $19,414.53 | $272,405.94 |
| 10/5/2052 | 5.500% | $100,000.00 | $272,405.94 | 41.0475 | 366 | $15,023.37 | $187,429.31 |
| 10/5/2053 | 5.500% | $100,000.00 | $187,429.31 | 28.2428 | 365 | $10,308.61 | $97,737.92 |
| 10/5/2054 | 5.500% | $100,000.00 | $97,737.92 | 14.7276 | 365 | $5,375.59 | $3,113.51 |
| 10/5/2055 | 5.500% | $100,000.00 | $3,113.51 | 0.4692 | 365 | $171.24 | -$96,715.25 |

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**FARMERS & MERCHANTS BANK,**

      Creditor/Appellant,

      v.                            Civil Action No. 7:11-cv-119 (HL)

**JULIUS T. SOUTHALL, III,**

      Debtor/Appellee.

### ORDER

This Court undertakes an appellate review of an Order on a Motion for Valuation completed by the United States Bankruptcy Court for the Middle District of Georgia. For the reasons set forth below, the decision of the Bankruptcy Court is upheld.

### I. FACTUAL BACKGROUND

Debtor/Appellee Julius T. Southall, III ("Southall"), filed a Petition pursuant to Chapter 12 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Georgia on January 10, 2011. Creditor/Appellant Farmers & Merchants Bank ("F&M Bank") is a secured creditor of the Debtor, holding secured claims against the Southall's equipment, his 2008 Chevrolet truck, and 505.31 acres of real estate belonging to him. The 505.31 acres of real estate is comprised of two tracts of land, one 200-acre tract

and one 305.31-acre tract. Only the real estate is at issue for purposes of this appeal.

A valuation hearing was held by the Bankruptcy Court on July 27, 2011 in front of the Honorable John T. Laney, III, United States Bankruptcy Judge for the Middle District of Georgia. During the hearing, Southall introduced Mr. Lauchin McKinnon Rozier, III ("Rozier") as an expert real estate appraiser. Mr. Rozier valued the 505.31 acres of real estate owned by Debtor at $1,550,000.00 – $650,000.00 for the 200-acre tract and $900,000.00 for the 305.31-acre tract. F&M Bank introduced Mr. Brian Massingill ("Massingill") as an expert appraiser. Mr. Massingill valued the two properties significantly higher than Mr. Rozier, appraising the properties for $2,342,000.00, or $1,423,000.00 for the 305.31-acre tract and $920,000.00 for the 200-acre tract.

After hearing the evidence, the Bankruptcy Court decided the issue of valuation from the bench, relying on Mr. Rozer's appraisal for the final valuation. The Bankruptcy Court declined to take Mr. Massingill's testimony into consideration, finding that it did not properly consider the use of the property. Mr. Massingill did not consider the fact that the 505.31 acres was used as a farming operation, which the Bankruptcy Court determined was fatal to his valuation. The court stated:

> … I do not believe that I have an expert opinion that meets the test of Section 506 except for Mr. Rozier's testimony for the debtor. And the other testimony by the other appraisers does not – in one case, it doesn't consider at all the use of the property. In the other case, considers only a little bit of the use of the property.

2

> So, I'm going to find that the valuation of – for purposes of
> confirming a plan at this time that proposes to continue to farm the
> property and the 305 acres is $900,000.00 as Mr. Rozier testified.
>
> Now, as to the 200 acres, again it's difficult to give much weight to
> Mr. Massingill's testimony because it didn't take into consideration
> the farming operation. …

The Bankruptcy Court's decision not to consider Mr. Massingill's testimony

led to this appeal.

## II. STANDARD OF REVIEW

The district court, in reviewing a decision of a bankruptcy court, functions

as an appellate court. *See* Williams v. EMC Mortg. Corp. (In re Williams), 216

F.3d 1295, 1296 (11th Cir. 2000) (per curiam). On appeal from a bankruptcy

court, district courts "may affirm, modify, or reverse a bankruptcy judge's

judgment, order, or decree or remand with instructions for further proceedings."

Fed. R. Bankr. P. 8013. A court must accept the bankruptcy court's findings of

fact unless those facts are clearly erroneous. Id. Conclusions of law, however,

including a bankruptcy court's interpretation and application of the Bankruptcy

Code, are reviewed de novo. *See* Nordberg v. Arab Banking Corp. (In re Chase

& Sanborn Corp.), 904 F.2d 588, 593 (11th Cir. 1990).

## III. ANALYSIS

The crux of the issue before this Court is the proper interpretation of 11

U.S.C. § 506(a), a provision of the Bankruptcy Code that dictates the method of

valuation of collateral in bankruptcy proceedings. Section 506 of the Bankruptcy

Code provides general principles to be followed in determining what standard of

3

valuation is proper in calculating the value of a creditor's secured claim. Matter of Lackow Bros., Inc., 752 F.2d 1529 (11th Cir. 1985). This section provides that a claim

> is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property …

11 U.S.C. § 506(a).

The Supreme Court of the United States interpreted § 506(a) in their 1997 decision Associates Commercial Corp. v. Rash, 520 U.S. 953, 117 S. Ct. 1879, a case addressing the value of a trailer truck in a chapter 13 bankruptcy proceeding where the debtor had invoked the so-called "cram down" option under 11 U.S.C. § 1325(a)(5)(C).[1] In that case, the Bankruptcy Court applied a method of valuation called a replacement value theory, which is based on what the debtor would have to pay to purchase a similar vehicle. Id. at 957, 117 S. Ct. at 1883. The Eastern District of Texas affirmed. Id. The Fifth Circuit reversed the district court's decision, opting to use a foreclosure value theory, which determines the value of a claim based on what a debtor would realize upon

---

[1] Under the cram down option, "the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim …, and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the collateral." Rash, 520 U.S. at 957, 117 S. Ct. at 1882-83 (internal citations omitted). "[T]he creditor is exposed to 'double risks' in that the debtor keeps the collateral under a court-imposed 'crammed down' financing arrangement." In re Perez, 318 B.R. 742, 744 (Bkrtcy. M.D. Fla. 2005) (quoting Rash, 520 U.S. at 962-63, 117 S. Ct. at 1879).

4

foreclosure and sale of the collateral. Id. The Supreme Court reversed the Fifth

Circuit, determining that a replacement theory of valuation was most appropriate

under § 506(a).

      In making their decision, the Court analyzed § 506(a) and reasoned that it

has two parts. Id. at 961, 117 S. Ct. at 1884. The first part of § 506 addresses

whether a claim is secured or unsecured. Id. The second part of § 506, and the

part on which the Court placed its primary focus, provides instruction on how to

value the claim. Id., 117 S. Ct. at 1885. Specifically, the second part states that

the claim "shall be determined in light of the purpose of the valuation and of the

proposed disposition or use of such property." Id. The Court reasoned that if a

foreclosure value theory was used, it would render the phrase "proposed

disposition and use" meaningless because the valuation would not take into

account whether the collateral was retained or surrendered by the debtor – both

options available to the debtor in a cram down case. Id. The failure to

differentiate between the two options would be unfair to the creditor because of

the possibility that the debtor might default again and the property would then be

deteriorated from extended use. Id. at 962-63, 117 S. Ct. at 1879. The Rash

Court further explained that a foreclosure value theory would be inappropriate

because the court-imposed payment terms available to the debtor under the

cram down provisions of chapter 13 "displaces a secured creditor's state-law

right to obtain immediate foreclosure upon a debtor's default." Id. at 964, 117 S.

Ct. at 1879. Without the option to foreclose, using a foreclosure value theory would be nonsensical.

In this case, the parties have presented two opposing interpretations of the Rash decision and its application of § 506(a). F&M Bank argues that, under Rash, the phrase "proposed disposition or use" means that courts should consider whether the collateral will be retained or surrendered by the debtor at the conclusion of the bankruptcy proceedings. According to F&M Bank, the Bankruptcy Court adopted an unreasonably narrow interpretation of the phrase "proposed disposition or use" by looking at the specific use of the collateral as opposed to the ultimate disposition of the collateral.

On the other hand, Southall argues that § 506 should be interpreted as requiring the court to consider the specific use of collateral for proper valuation, stating that the specific use is controlling in determining the method to be used by an appraiser. Southall argues that, according to Rash, an appraiser must value collateral using a replacement value theory, which in this case would mean valuing the property according to what a willing family famer would pay a willing seller. Southall contends that to value what someone would be willing to pay for a similar asset, the specific characteristics of the collateral must be taken into consideration. This Court adopts Southall's interpretation of § 506.

There is no indication in the plain text of § 506 or in the text of the Rash decision that the phrase "proposed disposition or use" should be interpreted only in the context of the debtor's ultimate decision about retaining or surrendering the collateral in question. To the contrary, the Rash Court held that under § 506(a), the proper method of valuation was a replacement value theory that takes into consideration relevant factors in each case to find the "cost the debtor would incur to obtain a like asset for the same 'proposed … use.'" 520 U.S. at 965, 117 S. Ct. at 1886. Thus, according to this Court's reading of Rash, considering the specific use of the collateral is not only advisable, but necessary under § 506. If land is used as farmland, as in this case, the valuation must take into consideration relevant factors like soil analysis, availability of water, percentage of crop land to total land, agricultural history, and irrigation statistics. Only by using these factors can the court determine the cost a person would pay to obtain a like asset and obtain a proper valuation.

It is undisputed that Mr. Massengill did not consider the property at issue as farmland, but instead conducted his appraisal by valuing the property as vacant land. He stated during his testimony at the valuation hearing that "I was asked to appraise both tracts simply as vacant land regardless of improvements except for the contributory value of the home located on the property." (Doc. 1-4, p. 4.) Mr. Massengill admitted that he did not consider whether the land was irrigated or cultivated, farmland or timberland. (Doc. 1-4, p. 8.) Instead, he evaluated the property as if it was "any large tract in Lowndes County." Id.

7

According to this Court's reading of § 506, Mr. Massengill's appraisal fails to take into consideration the relevant factors that demonstrate the debtor's use of the property. Thus, his appraisal does not properly account for the "disposition and use" under § 506(a) and is not a proper consideration in the valuation of the collateral.

## IV. CONCLUSION

In Rash, the Supreme Court stated that "[a]s we comprehend § 506(a), the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question." Id. at 962, 117 S. Ct. at 1885. Mr. Massengill's appraisal failed to consider the "proposed disposition or use", and thus, his appraisal is not suitable for consideration by the court. The Bankruptcy Court was correct is disregarding his appraisal and testimony, and thus, the decision of the Bankruptcy Court is upheld.

**SO ORDERED**, this 13th day of July, 2011.

*s/ Hugh Lawson*
HUGH LAWSON, SENIOR JUDGE

ebr

8

# EXHIBIT "C"

Peter A. Orville, Esq.
Peter A. Orville, P.C.
30 Riverside Drive
Binghamton, New York 13905

Patrick G. Radel, Esq.
Getnick Livingston Atkinson & Priore, LLP
258 Genesee Street, Suite 401
Utica, New York 13502

*In Re: Howe Farms LLC (Lead Case)*
    Chapter 12 Case No.: 13-61601

    *Richard C. Howe*
    Chapter 12 Case No.: 14-60223

    *Mark F. Howe*
    Chapter 12 Case No.: 14-60360

## LETTER-DECISION AND ORDER

Before the Court is an objection to confirmation of a joint Chapter 12 plan proposed in

the jointly administered cases by Debtors Howe Farms LLC, Richard C. Howe, and Mark F.

Howe ("Debtors") on April 30, 2014. (The "Joint Plan," ECF No. 61.) NBT Bank, National

Association ("NBT"), a secured creditor in the cases, filed the objection on May 29, 2014. (The

"Objection," ECF No. 71.) Despite counsels' best efforts over the past several months, the

parties have been unable to reach a resolution as to the treatment of NBT's secured claims

collateralized by personal property. Accordingly, the parties have asked the Court to determine

the narrow issue of whether Debtors' proposed treatment of NBT's personal property secured

claims is commercially reasonable and therefore satisfies the requirement of 11 U.S.C.

("Bankruptcy Code") § 1225(a)(5)(B)(ii), which provides that "the value, as of the effective date

of the plan, of property to be distributed by the trustee or the debtor under the plan on account of

such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1225(a)(5)(B)(ii)

(2012). The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a), (b)(1), and (b)(2)(L).

Debtors Howe Farms LLC, Richard C. Howe, and Mark F. Howe filed their voluntary Chapter 12 petitions on October 1, 2013, February 18, 2014, and March 12, 2014, respectively. Through counsels' ongoing negotiations, the parties have agreed to adequate protection payments and the relevant facts underpinning this dispute. The parties filed a Joint Stipulation of Facts on July 23, 2014. (The "Stipulation," ECF No. 92.) NBT and Debtors also filed memoranda of law on August 11, 2014. (ECF Nos. 98 and 101, respectively.) Together with their memorandum of law, Debtors filed an Affidavit of Mark F. Howe. (The "Howe Affidavit," ECF No. 101.) Together with its memorandum of law, NBT filed an Affidavit of Mary A. Pulver, Vice President in the Commercial Lending Division and Senior Agricultural Relationship Manager for NBT. (The "Pulver Affidavit," ECF No. 99.) NBT filed a reply letter brief on August 13, 2014. (ECF No. 104.) Following a hearing on September 9, 2014, the Court then took the matter under advisement for issuance of this Letter-Decision and Order.

NBT holds a first priority, duly perfected security interest in accounts, livestock, and farm equipment owned by Howe Farms LLC. (Stip. ¶ 6.) NBT does not dispute either that its personal property claims are substantially undersecured and therefore subject to "cram down" under Bankruptcy Code § 1225(a)(5)(B) or that the fair market value of its personal property collateral was $367,300.00 as of the date of filing, which figure was comprised of $110,000.00 in livestock, $6,000.00 in bank account funds, and $251,300.00 in farm equipment. (NBT's Mem. of Law at 2; Stip. ¶ 7.) NBT does, however, object to Debtors' proposed "cram down" terms. Debtors propose under the Joint Plan to pay all of their monthly disposable income of $3,000.00 into the Joint Plan for sixty (60) months and to repay NBT's secured claims, which totaled

$1,310,473.60 as of the date of filing (Stip. ¶ 2), as long-term debt to be paid in full over thirty

(30) years at the rate of 5% interest per annum in monthly payments of $2,684.11, or $32,209.32

annually.[1]  Debtors have since conceded that the Joint Plan's original terms with respect to

NBT's personal property secured claims are not commercially reasonable and they have

alternatively in their memorandum of law proposed to pay these claims as long-term debt to be

amortized over a twelve (12) year period at the rate of 6% per annum with a balloon payment

due at the end of seven (7) years.  (Debtors' Mem. of Law at 5–6.)

NBT asserts in its Objection and submissions that the proposed treatment of its personal

property secured claims is not commercially reasonable and does not afford it the present value

of these claims because: (1) the reamortized repayment term greatly exceeds the original loan

terms; and (2) the interest rate is far below the interest rate that the market would impose upon an

obligation of similar circumstances and risk. NBT's analysis focuses more precisely on factors

such as the preexisting contract terms between the parties, customary lending practices, the

nature of the collateral, the propriety of a balloon payment, and the risk of default.

---

[1] The parties have reached an agreement for the repayment of NBT's secured claims collateralized by real property. NBT's real property secured claims will be allowed in the aggregate amount of $310,000.00, to be paid in full over twenty (20) years at a rate of 5.25% per annum in monthly payments of $2,088.92. (Stip. ¶ 5.) The Joint Plan contemplates the payment of these and other claims by the Trustee. Simple calculations show that the Joint Plan, as filed, is significantly underfunded and infeasible. Payment on NBT's secured claims alone under the agreed and proposed terms would amount to significantly more than Debtors' proposed monthly plan payment. The Joint Plan is insufficient to fund even these Class 1 claims, leaving no funds from which the Trustee may pay the Trustee's commissions, administrative claims, or Class III, IV, or V claims. NBT has also objected to the Joint Plan on the ground that it fails to satisfy the feasibility requirement of Bankruptcy Code § 1225(a)(6), which provides that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1225(a)(6). The Trustee has similarly objected to the Joint Plan on the grounds that it fails to satisfy the best interests of creditors and feasibility tests set forth in Bankruptcy Code § 1225(a)(4) and (a)(6), respectively. ("Trustee's Supplemental Objection," ECF No. 90.) See 11 U.S.C. § 1225(a)(4) (requiring a Chapter 12 plan to provide for the holders of allowed unsecured claims to receive property worth at least as much under the plan as they would receive if the bankruptcy estate were instead liquidated under Chapter 7 and they were paid with liquidation proceeds) and (a)(6). Following the Court's limited ruling herein, Debtors will therefore need to reassess their situation to determine whether they have the financial means to continue in Chapter 12 and, more immediately, whether they can successfully defend NBT's pending motion for relief from stay pursuant to Bankruptcy Code § 362(d). NBT filed the motion for relief from stay on October 4, 2013. (The "Stay Relief Motion," ECF No. 5.) At NBT's request and pursuant to the most recent adequate protection order issued on October 8, 2014, the Stay Relief Motion has been restored to and made returnable on the Court's October 20, 2014 motion calendar. (ECF No. 106.)

With regard to the repayment term, NBT acknowledges that Bankruptcy Code § 1229(b)(9) explicitly permits secured claims to be paid over a long-term period exceeding the plan term. *See* 11 U.S.C. § 1229(b)(9). NBT contends, however, that there is an outside limit the Court must impose on the length of repayment on a case-by-case basis by reference to the original loan terms, customary lending practices, and market standards.

Here, Mark F. Howe, Scott A. Howe, and/or Richard C. Howe executed five (5) promissory notes payable to NBT. The first promissory note was payable on demand, with a variable interest rate that was initially 9.250%. (Pulver Aff. ¶¶ 12–13.) The second through fourth promissory notes were payable in twelve (12) months, with a variable interest rate that was initially 5.50%. (Pulver Aff. ¶¶ 14–19.) The fifth promissory note was payable in eight (8) months, with a variable interest rate that was initially 6.0%. (Pulver Aff. ¶¶ 20–21.)

NBT's designated expert, Ms. Pulver, opines that customary lending practices would not allow for repayment of a loan secured only by livestock and farm equipment over a twelve (12) or thirty (30) year period, even with a seven (7) year balloon payment. (Pulver Aff. ¶ 25.) Rather, Ms. Pulver states that customary lending terms for this type of loan range from five (5) to seven (7) years, with seven (7) year terms being extended only to borrowers with outstanding credit and favorable loan to value ratios. (Pulver Aff. ¶ 27.) Ms. Pulver's analysis of Debtors' herd maintenance statistics, financial history, and loan to value ratio of 1:1 leads her to conclude that Debtors would not be able to receive financing from any commercial lender. She suggests that, even if a commercial lender would lend under such circumstances, it is likely that the indebtedness would be payable "on demand" or on a very short one (1) to two (2) year schedule—which is consistent with the terms upon which NBT was lending to Debtors when they filed for bankruptcy protection. The seven (7) year balloon payment does not change Ms.

Pulver's analysis because Debtors did not offer proof either that they will be able to fund the same or that the value of the collateral will remain stable during that length of time. (Pulver Aff. ¶ 34.)

With regard to the interest rate, NBT contends that the same considerations– the original loan terms, customary lending practices, and market standards–govern the interest rate determination. In Ms. Pulver's experience, agricultural borrowers with good financial prospects, but past credit problems, typically receive rates between 7.25% and 8.5%. (Pulver Aff. ¶ 35.) She avers that, based on Debtors' history and present financial condition, they are a high risk borrower for a lender to extend credit to and, therefore, an appropriate interest rate for such credit would be between 9% and 10%. Ms. Pulver further opines that, based on her analysis of Debtors' financial projections and operating reports, the risk of default and irreparable harm to NBT is significant because Debtors' financial projections are unreasonable, their monthly operating reports show negative cash flow and a significant, recurring monthly deficit, and the collateral securing NBT's personal property claims is highly vulnerable and subject to rapid depreciation. (Pulver Aff. ¶¶ 37–40.)

Debtors, on the other hand, argue that their proposed terms for the repayment of NBT's personal property secured claims are commercially reasonable because the value of the collateral will remain stable or increase over the course of seven (7) years and NBT has in the past issued loans to Debtors upon terms where monthly payments were based on long amortization schedules with balloon payments at a much earlier maturity date. Debtors suggest that the parties' past dealings and lending relationship should be given considerably more weight than customary lending practices and market standards. (Debtors' Mem. of Law at 7.) Moreover, Debtors assert that they have in good faith shown that they will be able to make the required

balloon payment at the end of seven (7) years, and they urge the Court to consider that the difference between the terms they have proposed and those advocated by NBT could very well be the difference between the Joint Plan's success or failure. In particular, Mark F. Howe states that Debtors will be able to pay the balloon payment when due because he believes there will be sufficient equity in the livestock and farming equipment to cover the balloon payment and he believes that Debtors will be able to obtain a new loan to payoff NBT either through an institutional or private lender once he can show at least four (4) years of consistent Chapter 12 plan payments. (Howe Aff. ¶¶ 2, 4–5.)

As the Plan's proponent, Debtors bear the burden of proving that the Joint Plan satisfies all of the requirements for confirmation set forth in Bankruptcy Code § 1225(a), including the present value requirement under subsection (a)(5)(B)(ii). *In re Torelli*, 338 B.R. 390, 395 (Bankr. E.D. Ark. 2006) (collecting cases); *In re Michels*, 301 B.R. 9, 13 (Bankr. N.D. Iowa 2003) (citing *In re Szudera*, 269 B.R. 837, 842 (Bankr. D. N.D. 2001)), *aff'd, Michels v. Maynard Sav. Bank (In re Michels)*, 305 B.R. 868 (B.A.P. 8th Cir. 2004). It is well established that a secured creditor in bankruptcy is entitled to the full value of its secured claim. *In re Foertsch*, 167 B.R. 555, 563 (Bankr. D. N.D. 1994) (citing *In re Kloberdanz*, 83 B.R. 767, 770 (Bankr. D. Colo. 1988)). However, a Chapter 12 debtor is permitted to treat a secured creditor's claim as a long-term debt payable beyond the length of the plan pursuant to Bankruptcy Code § 1222(b)(9) if the plan provides that the secured creditor will retain its lien and receive the present value of its claim in compliance with Bankruptcy Code § 1225(a)(5)(B). 11 U.S.C. § 1222(b)(9). In cases where the secured creditor refuses to accept the proposed plan, Bankruptcy Code § 1225(a)(5)(B) allows the debtor to retain liened collateral and "cram down" a creditor's allowed

Case 13-61601-6-dd    Doc 110    Filed 10/16/14    Entered 10/16/14 09:03:37    Desc Main
                    Document        Page 7 of 10

secured claim if the value of the claim is "demonstrably preserved." *In re Foertsch*, 167 B.R. at

563 (citing *In re Fenske*, 96 B.R. 244, 248 (Bankr. D. N.D. 1988)).

The present value requirement under Bankruptcy Code § 1225(a)(5)(B)(ii) forces the

debtor to provide for payments to creditors over a reasonable repayment term at a reasonable rate

of interest. *In re Standley*, 2013 Bankr. LEXIS 1114, at *16 (Bankr. D. Mont. Mar. 22, 2013)

(citing *In re Steinmetz*, 10 B.R. 150, 158 (Bankr. D. Mont. 1991)). The Court will briefly

address each prong of this requirement and its application to the Joint Plan.

"While the Code does not specifically limit the repayment period, the present value and

feasibility provisions imply such limits." *In re Torelli*, 338 B.R. at 397 (citing *In re Dunning*, 77

B.R. 789, 793 (Bankr. D. Mont. 1987) (quoting *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125

(Bankr. D. Mont. 1987)). "When considering the length of loan term, the court can base a ruling

on such facts as the preexisting contract length and the customary length of repayment of similar

loans." *Id.* (collecting cases).

In the present case, of the five (5) promissory notes executed by Debtors Mark F. Howe,

Scott A. Howe, and/or Richard C. Howe and made payable to NBT, the longest original

repayment term was twelve (12) months, which in turn carried a variable interest rate that was

initially 5.5%. (Pulver Aff. ¶¶ 12–21.) Given the original repayment terms, the current

feasibility problem with the Joint Plan, and Ms. Pulver's valid concerns regarding depreciation

and risk of loss of the collateral given the nature of the collateral, the Court agrees with NBT that

Debtors' proposed repayment term is well outside the acceptable parameters that this Court may

approve.

Even if Debtors' proposed repayment term was sufficient for purposes of Bankruptcy

Code § 1225(a)(5)(B)(ii), which it is not, Debtors would need to prove that their proposed

interest rate is also reasonable. Payments provided under a plan of reorganization that proposes to pay the secured creditor of an allowed secured claim in deferred installments must be discounted by an appropriate or equitable rate of interest. *In re Michels*, 301 B.R. at 16; *In re Howard*, 212 B.R. 864, 870–71 (Bankr. E.D. Tenn. 1997) ("Although in actuality the rate to be determined is a discount rate rather than a true interest rate, courts and litigants usually speak in terms of interest rate because the easiest way to determine present value for purposes of [Bankruptcy Code] § 1225(a)(5)(B)(ii) . . . is to ascertain the allowed amount of the secured claim and then apply to that amount an appropriate interest rate to ensure that the present value of payments to the secured creditor will at least equal the allowed amount of the secured claim.") (internal citation omitted). The determination of whether the proposed discount or interest rate is appropriate or equitable in the face of an objection by the secured creditor is a factual inquiry that must be made on a case-by-case basis. *In re Foertsch*, 167 B.R. at 564 (citing *United States v. Doud*, 869 F.2d 1144, 1146 (8th Cir. 1989)).

Since the Bankruptcy Code does not provide any guidance on how to determine an appropriate or equitable rate of interest, courts are necessarily guided by customary lending practices and, more specifically, the current market rate for similar loans made in the region at the time of the reorganization. *In re Ellis*, 478 B.R. 132, 140 (Bankr. N.D.N.Y. 2012); *In re Foertsch*, 167 B.R. at 564 (collecting cases). The Court in its interest rate determination must therefore "'consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration for the quality of the security and the risk of subsequent default.'" *In re Foertsch*, 167 B.R. at 564 (quoting *United States v. Doud*, 869 F.2d at 1146); *see also In re Torelli*, 338 B.R. at 396 (focusing on the United States Supreme Court's dicta in *Till v. SCS Credit Corp.*, 124 S. Ct. 1951 (2004), that several Bankruptcy Code sections, including

Bankruptcy Code § 1225(a)(5)(B)(ii), require a court to discount a stream of deferred payments back to their present value and directing courts in such cases to begin with and adjust the prime rate based upon factors such as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization) (citing *Till v. SCS Credit Corp.*, 124 S. Ct. 1951, 1961 (2004)).

According to Ms. Pulver, whom this Court has no reason to doubt based upon the record presented, the appropriate interest rate for a new loan to Debtors would be between 9% and 10% at worst and 7.25% to 8.5% at best. (Pulver Aff. ¶ 35.) Given her experience and position in the agricultural industry, the Court is compelled to accept Ms. Pulver's assertion that this range of rates is what Debtors would have to pay a creditor in order to obtain a new loan on equivalent terms in the open market. Moreover, there is an insufficient equity cushion and a lack of other safeguards to protect NBT from collateral loss and diminution in collateral value given the nature of the collateral at issue during the deferred repayment. These factors, as well as the lack of evidence to prove that Debtors will be able to make the balloon payment at the end of the seven (7) year period, suggest that if the Court were to approve Debtors' proposed interest rate, the value of NBT's interest would be unduly jeopardized. While the Court is mindful of the need to strike a balance between adequately compensating NBT for the risks associated with the proposed "cram down" contemplated by the Joint Plan and the setting of an interest rate that is not so high as to doom Debtors' reorganization, the Court finds that the 6% interest rate proposed by Debtors in their memorandum of law does not give NBT the present value of its personal property secured claims.

In sum, neither Debtors' proposed repayment term nor the interest rate to be applied to NBT's personal property secured claims are reasonable or consistent with customary lending

practices or market rates.  In fact, Debtors have not provided any evidence to address the burden

they carry.  In stark contrast, NBT has presented Ms. Pulver's convincing testimony in affidavit

form, which Debtors have not adequately challenged or controverted.  Because the Joint Plan and

Debtors' amended proposal to "cram down" NBT's personal property secured claims do not

satisfy the dictates of Bankruptcy Code § 1225(a)(5)(B)(ii), NBT's Objection is sustained and

confirmation of the Joint Plan is denied.

It is SO ORDERED.

Dated: October 16, 2014
       Utica, New York

/s/Diane Davis
DIANE DAVIS
United States Bankruptcy Judge